## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.*<br>SARAH A. FEINBERG,<br>844 West Glebe Road<br>Alexandria, Virginia 22305,<br><br>        Plaintiff,<br><br>        v.<br><br>BOOZ ALLEN HAMILTON INC.,<br>8283 Greensboro Drive<br>McLean, Virginia 22102,<br><br>        Defendant. | Case No. 1:16-cv-01911<br><br>**(Filed *in camera* and under seal, pursuant to 31 U.S.C. § 3730(b)(2))**<br><br>**(Jury trial demanded)** |

### FIRST AMENDED COMPLAINT

This action arises from the illegal acts committed by Defendant to obtain payment of false claims by the United States of America in violation of the False Claims Act, 31 U.S.C. §§ 3729-33. Relator Sarah A. Feinberg brings the Claims for Relief stated in this Complaint in the name of the United States under the *qui tam* provisions of the False Claims Act. Ms. Feinberg complains and alleges as follows:

### INTRODUCTION

1. Defendant Booz Allen Hamilton Inc. ("Booz") is a wholly owned subsidiary of Booz Allen Hamilton Holding Corporation, a publicly traded company. Booz is a consulting company that claims more than $5.8 billion of annual revenue, the great bulk of which it derives from literally thousands of contracts with the United States government. Booz's annual report (SEC Form 10-K) labels Booz a "values-driven organization," and, when this lawsuit was filed, Booz touted on its website "core values" of "fairness," "integrity," and "trust."

2.   Rather than faithfully performing its contracts with our federal government (much less doing so fairly, with integrity, or in a manner worthy of trust), however, Booz has been overcharging the government.  It has been doing so to subsidize its efforts to expand its traditional government-contracting business into consulting for private industry and foreign governments (its "Commercial / International" operations).  More particularly, for the last approximately five years, Booz has been losing millions of dollars in a new effort to build and grow its Commercial / International operations, but then fraudulently has charged its excess costs in connection with that effort to the United States government as reimbursable costs under its government contracts.

3.   Booz not only knowingly has submitted these false claims for cost reimbursements, but has done so with such frequency, and to cover Commercial / International losses and excess costs of such magnitude, that, on information and belief, the amount fraudulently collected from the United States now exceeds a quarter billion dollars, with Booz's own internal projections forecasting that amount to reach nearly a half billion dollars by the close of Booz's next fiscal year, Fiscal Year 2019.  (Booz's fiscal year runs from April 1 of one year through March 31 of the next year such that, for example, Fiscal Year 2018 covers the time period April 1, 2017 through March 31, 2018).

4.   By this action, Ms. Feinberg seeks to recover that money for the United States and its taxpayers, with appropriate penalties and interest, and a relator's award as provided in the False Claims Act.

## JURISDICTION AND VENUE

5.   This Court has subject matter jurisdiction of this action under 31 U.S.C. § 3732(a) (jurisdictional provisions of the False Claims Act), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1345 (United States as a plaintiff).

6.   This Court has personal jurisdiction over Booz because Booz regularly transacts business in this District, including a substantial part of the events or omissions described herein.

7.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Booz transacts business in this District and a substantial part of the acts and false claims giving rise to this action occurred in this District.

8.   As provided by 31 U.S.C. § 3730(b)(2), this action has been filed *in camera* and under seal, and has not been served on Booz.  As also provided by § 3730(b)(2), Ms. Feinberg timely served the initial complaint on the United States, and has provided the United States Attorney General and the United States Attorney for the District of Columbia the required "written disclosure."

9.   Ms. Feinberg now files this First Amended Complaint to amplify certain allegations contained in the original complaint.

## PARTIES

10. The plaintiffs in this action are Ms. Feinberg and the United States of America.

11. Ms. Feinberg is a resident of Alexandria, Virginia.

12. Ms. Feinberg brings her Claims for Relief in the name of the United States of America.  The United States is an appropriate party plaintiff for the Claims for Relief by virtue of 31 U.S.C. § 3730(b).

13. Booz is headquartered in McLean, Virginia. It engages in business operations throughout the United States and the world, including particularly in the District of Columbia, where it maintains multiple offices.

## FACTS

**I.     The United States' Reimbursement of Costs Under Federal Contracts.**

14. Many federal government contracts, including many of the thousands of contracts held by Booz, require the United States to reimburse the contractor for certain costs incurred by the contractor in performing its contractual obligations.

15. The reimbursable costs are only those "allowable" under federal law, including under the Federal Acquisition Regulations, which are collected at Chapter 1 of Title 48 of the Code of Federal Regulations. *See, e.g.*, 48 C.F.R. 31.201-1(b) ("[T]he allowable costs to the Government are limited to those allocable costs which are allowable pursuant to Part 31 and applicable agency supplements.").

16. "A cost is allowable only when the cost complies with all of the following requirements: (1) Reasonableness. (2) Allocability. (3) Standards promulgated by the CAS Board [the Cost Accounting Standards Board], if applicable, otherwise generally accepted accounting principles and practices appropriate to the circumstances. (4) Terms of the contract. (5) Any limitations set forth in this subpart [Subpart 31.2 of Part 31 of Subchapter E of Chapter 1 of Title 48]." 48 C.F.R. 31.201-2 ("Determining allowability").

17. As to "[r]easonableness": "[T]he burden of proof shall be upon the contractor to establish that [any particular] cost is reasonable." 48 C.F.R. 31.201-3 ("Determining reasonableness"). "What is reasonable depends on a variety of considerations and circumstances, including— (1) Whether it is the type of cost generally recognized as ordinary

and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's length bargaining, and Federal and State

laws and regulations; (3) The contractor's responsibilities to the Government, other customers,

the owners of the business, employees, and the public at large; and (4) Any significant deviations

from the contractor's established practices." *Id.*

18. As to "[a]llocability": "A cost is allocable if it is assignable or chargeable to one

or more cost objectives on the basis of relative benefits received or other equitable relationship.

Subject to the foregoing, a cost is allocable to a Government contract if it- (a) Is incurred

specifically for the contract; (b) Benefits both the contract and other work, and can be distributed

to them in reasonable proportion to the benefits received; or (c) Is necessary to the overall

operation of the business, although a direct relationship to any particular cost objective cannot be

shown." 48 C.F.R. 31.201-4 ("Determining allocability").

19. Beyond these basic tenets of government contracting, Booz's actual contracts

provide the government with additional protections against improper demands for cost

reimbursements. For example, where a contractor submits false claims to the federal

government, and an employee internally blows the whistle regarding that misconduct, the

contractor must disclose that misconduct to the government, per the following FAR-mandated

contract clause: "The Contractor shall timely disclose, in writing, to the agency Office of

Inspector General (OIG), with a copy to the Contracting Officer, whenever, in connection with

the award, performance, or closeout of this contract or subcontract thereunder, the Contractor has

credible evidence that a principal, employee, agent, or subcontractor of the Contractor has

committed-- . . . A violation of the civil False Claims Act (31 U.S.C.§ 3729-3733)." 48

C.F.R.52.203-13 ("Contractor Code of Business Ethics and Conduct").

20. Other federal law provisions provide additional protections. The Truth In

Negotiations Act ("TINA"), 10 U.S.C. § 2306a, 41 U.S.C. §§ 3501-09, for example, provides

that, for federal government contracts "using procedures other than sealed-bid procedures" and

with an expected price exceeding $500,000, the contractor must, with certain enumerated

exceptions, submit to the relevant contracting officer certain "cost or price data," with a

certification that "to the best of the person's knowledge and belief, the cost or pricing data

submitted are accurate, complete, and current."

**II.    Ms. Feinberg.**

21. Ms. Feinberg earned a full academic scholarship to The King's College (N.Y.).

22. Upon graduation from The King's College, Ms. Feinberg entered Officer

Candidate School with the United States Marine Corps. She graduated, and was commissioned

as a Second Lieutenant in the Marines.

23. Ms. Feinberg served as a Logistics Officer in the United States Marine Corps,

Reserves, for the next five years. Ms. Feinberg deployed to Iraq, where she commanded more

than thirty (30) Combat Logistics Patrols. She rose steadily to the rank of Captain. In 2010, she

was recognized as the Marine Corps Reserve Junior Officer of the Year.

24. Ms. Feinberg next joined Booz, initially to consult on contracts related to the

Marine Corps and the United States' drawdown of forces in Afghanistan. At Booz, Ms. Feinberg

again rose steadily, serving as a Senior Consultant, Associate, and finally Lead Associate. Again

she was honored for her excellence: this time with Booz's "Values in Practice" award, the

company's most prestigious employee performance award.

25. In 2015, after a leave from Booz, Ms. Feinberg earned her MBA from the

University of Pennsylvania's Wharton School of Business.

26. Ms. Feinberg returned to Booz in 2015 to support the Chief Financial Officer (Kevin Cook at the time; replaced effective July 1, 2016 by Lloyd Howell) as part of a 3-person initiative known as FIN-01. The FIN-01 initiative was associated with Booz's Financial Planning and Analysis ("FP&A") team. Booz tasked the initiative with identifying recommended improvements to the company's ability to track and analyze internal financial data, and accurately to forecast and report based on that data.

27. R. Timothy Lawrence, Booz's Vice-President for FP&A, led the FIN-01 initiative. Along with Ms. Feinberg, Thomas ("Tad") Walls Jr. served on the team. Mr. Lawrence's primary office was located in the District of Columbia, at 20 M Street, Southeast.

28. In 2016, Booz management, including Mr. Lawrence, told Ms. Feinberg that based on her performance throughout the FIN-01 initiative, the firm's leadership was interested in her moving into a more senior role such as helping to lead investor relations.

29. Instead, however, on August 8, 2016, having discovered the misconduct outlined below, and having been rebuffed by Booz's management in her effort to have Booz rectify that misconduct, as also described below, Ms. Feinberg tendered her resignation. Ms. Feinberg's last day at Booz was August 26, 2016.

III.   **Booz's Improper Conduct.**

30. In performing her FIN-01 initiative responsibilities, Ms. Feinberg developed knowledge about Booz's efforts to advance its Commercial / International operations. Booz previously had maintained such capabilities but in 2008 had spun them off, as a separate legal entity, "Booz & Company." (PricewaterhouseCoopers later acquired Booz & Company and renamed the entity "Strategy&"). Booz soon had regretted not maintaining commercial and

international operations (in addition to its core government contracting operations), and by Fiscal Year 2012 had begun substantial efforts to reestablish such capabilities.  Booz attempted to rebuild its Commercial / International operations not by acquisition, but organically.  Doing so proved extraordinarily expensive.

31. Indeed, Booz experienced, and is experiencing, massive losses on its Commercial / International operations, including actual and expected losses of $45.2 million in Fiscal Year 2015, $46.1 million in Fiscal Year 2016, $37.3 million in Fiscal Year 2017, $24.8 million in Fiscal Year 2018, and $5.3 million in Fiscal Year 2019.

32. Additionally, Booz has been declaring, and, upon information and belief, plans to continue to declare, a "job profit" from its Commercial / International operations, notwithstanding that in fact its costs from those operations far exceed its revenue from those operations.  Accounting for this artificially-declared "profit" reveals Booz's excess costs from its Commercial / International operations to total $75.3 million in Fiscal Year 2015, $81.2 million in Fiscal Year 2016, $108 million in Fiscal Year 2017, $113.3 million in Fiscal Year 2018, and $116 million in Fiscal Year 2019.

33. On information and belief, Booz's actual losses and excess costs in Fiscal Years 2013 and 2014 for its Commercial / International operations likewise were substantial.  For example, Booz's actual Fiscal Year 2014 losses for its Commercial operations alone amounted to an additional $11.8 million, which, after accounting for Booz's artificially-declared "profit" from those operations ($16.9 million), leaves $28.7 million in excess costs.

34. The losses and excess costs described above left the Commercial / International business operations unsustainable, yet Booz has been, and remains, desperate to grow that part of its business to re-diversify, in part to appease public investors.  To those investors, Booz has

touted its new operations; in 2015, for example, the Washington Post quoted a Booz executive vice president insisting: "We are 3.2 percent of revenue, but we are a much larger percentage of the profit margin."

35. Ms. Feinberg learned not only of Booz's overwhelming Commercial / International losses and excess costs, but also the means by which Booz has disguised those losses and costs, and kept those parts of its business afloat. More particularly, Ms. Feinberg discovered that, by mixing Booz's government contract work and Commercial / International operations in particular "Cost Centers," or "Cost Bands," and then charging the United States government for the inflated costs associated with those Cost Centers / Bands, the company was passing its excess Commercial / International costs on to the United States government via false claims for cost reimbursements under its government contracts.

36. Booz's scheme included, and includes, the following: On or about January 1 of each year, Booz discloses to the federal government reimbursement rates for certain Booz costs, organized by Cost Centers or Cost Bands. These rates consist, on a Cost Center / Band basis, of an hourly labor charge and a multiple, designed to capture Booz's necessary overhead to sponsor the labor.

37. The Cost Center / Band rates that Booz has been submitting to the federal government are fraudulent because Booz inflates them with the excess costs that it incurs in connection with its Commercial / International operations. The costs that Booz incurs in connection with its Commercial / International operations are not "allowable" under federal law, including the Federal Acquisition Regulations. Booz did not disclose this to the federal government (and, on information and belief, still has not done so) and instead falsely has presented the Cost Centers / Bands as reflecting allowable (e.g., reasonable and allocable) costs.

38. Booz subsequently compounds its duplicitous activity by certifying, on a regular basis, its costs as allowable (e.g., reasonable and allocable) insofar as it demands payment for those costs pursuant to its myriad government contracts.

39. Booz amplifies its misconduct in at least three additional ways. First, when at the close of a fiscal year Booz's costs in a particular Cost Center / Band exceed its revenue in that Cost Center / Band (a "rate variance" situation), Booz occasionally goes back to its U.S. government client demanding additional reimbursements to further subsidize its unexpectedly large, and unallowable, costs. Second, when Booz's costs in a particular Cost Center / Band end up lower than expected (a "CUT," or Cost Under Target, situation), Booz at least generally does not return the excess reimbursements it has obtained from the federal government. And, third, Booz includes the Strategic Investment ("SI") expenditures of its Strategic Innovation Group ("SIG") in the costs for which it seeks reimbursement under federal government contracts, notwithstanding that Booz knows that, for at least many of those costs (which alone amount to tens of millions of dollars annually), it cannot meet the requirement that it demonstrate a benefit to the federal government from that expenditure.

IV.     **Ms. Feinberg's Unsuccessful Efforts to Have Booz Rectify Its Misconduct.**

40. Ms. Feinberg took action: On Saturday, October 31, 2015, she emailed Mr. Lawrence, the FP&A head and her immediate supervisor, to alert him to her initial concerns. On that email, Ms. Feinberg copied her colleague Mr. Walls. Ms. Feinberg explained: "**[T]here is a major legal / DCAA [Defense Contract Auditing Agency] compliance issue b/c we have Commercial and Int'l staff aligned to Cost Centers where gov't staff are also aligned.**" (Emphasis in original). More particularly: "My understanding of the staff alignment to Cost Centers means that the U.S. gov't could be charged for overspending by Int'l staff who happen to

sit in the same Cost Center."  Relatedly, Ms. Feinberg raised the prospect of a "Cost Under Target (CUT)" situation in which less money is spent in a Cost Center / Band than anticipated "which means that we have a surplus at the end of the year [in that Cost Center / Band] and then have to return [i.e., should be returning] that money to the U.S. Treasury."  Ms. Feinberg concluded: "I'd like to discuss . . . the appropriate way to approach the legal risks associated with how we are subsidizing our Int'l business."

41. Mr. Lawrence responded:  "I can't believe we're not in compliance with DCAA," but initially expressed willingness to consider the issue further.  He suggested that Ms. Feinberg meet with Warren Kohm, Booz's Director of Financial Analytics and Strategy (the head of Booz's "FAS" team) and Elizabeth Novak, Booz's Director of Regulatory Compliance.

42. Ms. Feinberg arranged a November 3, 2015 meeting between Messrs. Kohm and Walls, and herself.  The evening before that meeting, Ms. Feinberg wrote to Mr. Lawrence, updating him on that scheduled meeting and explaining that, to address the concerns she had uncovered, she hoped to explore restructuring Booz's Cost Centers / Bands, including by aligning them to particular markets and "[t]aking Commercial and Int'l out of the Cost Centers."

43. On November 3, 2015, Ms. Feinberg met with Messrs. Kohm and Walls regarding Booz's need to disentangle its costs incurred in connection with its Commercial / International operations from those incurred in connection with its operations contracting with (and billing) the U.S. federal government.  The meeting lasted approximately one hour, and it occurred in Mr. Kohm's office.  Mr. Kohm began the meeting by closing his office door.  During the meeting, Mr. Kohm indicated that Mr. Lawrence had provided him advanced warning of Ms. Feinberg's concerns.  Mr. Kohm then explained that, while Booz's practices were in, at least, a "gray" zone, the U.S. Department of Defense's DCAA was "too stupid" or "not smart enough" to catch Booz,

and certainly would not be able to muster evidence adequate to recover the fraudulently obtained funds.  Mr. Kohm further stated, somewhat paradoxically, that Booz, in any event, had retained at least some reserves, should DCAA require repayment of the unallowable costs.  On that point, Mr. Kohm further observed that DCAA auditors receive credit for what they discover, not what they recover.  Ms. Feinberg understood him to mean that, even were DCAA to uncover Booz's misconduct, it would not be motivated to recover the full amount of Booz's overcharges. Finally, Mr. Kohm mocked Ms. Feinberg's concerns as generally quaint, including by relating an anecdote about a teacher requiring his or her students to be ready to work when the bell rings. According to Mr. Kohm, such a rule was inherently ambiguous, such that a student could choose to be in his or her seat, merely in the classroom, or even down the hall, at least so long as he or she was able to make eye contact with the teacher.

      44. Given Mr. Kohm's acknowledgement that he knew about and understood the Cost Center / Band issue (and thus the ongoing fraud on the government), and yet viewed it in such a cavalier fashion, Ms. Feinberg left this meeting substantially more concerned about the issue. Accordingly, she next set up a second meeting with Messrs. Kohm and Walls, this time also with Mr. Lawrence and Ms. Novak.  The five met telephonically for about an hour in late November 2015.  Ms. Novak acknowledged that there were risks to the current cost band structure and that it resulted in charges that likely would be declared unallowable by DCAA.  Ms. Novak also stated that, while this was a business risk that Booz had adopted several years ago, it should be reassessed once the company had completed the Fiscal Year 2017 planning cycle (which cycle would end on January 1, 2016).  Ms. Novak invited Ms. Feinberg to suggest a solution in the context of Booz's preparations for Fiscal Year 2018.

45. On December 17, 2015, Ms. Feinberg followed up on the Cost Center / Band issue by meeting with Jason Foster, a Senior Associate in Booz's Office of Regulatory Compliance, and Abigail Kurtz, an accountant in the same office. They met in Mr. Foster's office, for about two hours. This meeting covered a variety of issues connected to Ms. Feinberg's FIN-01 work, including particularly issues related to Booz's cost accounting. Mr. Foster expressed that he was extremely concerned about Booz's comingling in particular Cost Centers / Bands of costs incurred for both federal and non-federal work, and the justifications that would be required when DCAA began auditing the fiscal years in which Booz began incurring significant costs in re-starting its Commercial / International operations.

46. During this meeting, Mr. Foster also expressed two additional concerns. First, Mr. Foster expressed concern regarding Booz's use of Cost Centers / Bands to pass to the federal government, via federal contracts, the SI costs incurred by Booz's SIG. Those costs amount to tens of millions of dollars annually. According to Mr. Foster, those costs theoretically could be passed to the government because, unlike Booz's costs incurred in its Commercial / International operations, the SI expenditures arguably were intended, eventually, to benefit the government in connection with at least certain contracts. Booz, however, had no means of tracking any such benefits, and hence DCAA was likely ultimately to deem at least a portion of those costs unallowable. Second, Mr. Foster expressed concern that Booz often utilized its Cost Centers / Bands as "price points" based on the willingness of clients to pay for certain services, rather than building those Costs Centers / Bands based on Booz's actual costs incurred in delivering the capabilities (as stated in Booz's annual disclosure).

47. Ms. Feinberg summarized the December 17 meeting in an email to Mr. Lawrence, copying Mr. Walls, that she sent later that afternoon. Ms. Feinberg wrote, in part: "Jason

[Foster] brought up the issue that any changes to cost accounting [would] introduc[e] greater risk for audit which turned into a longer conversation regarding his concerns w/ how we currently align our people to Cost Bands, how we fund and allocate SI, how the Cost Center strategy is outdated, and this being an ideal time to evaluate our Cost Center Strategy to enable future growth and mitigate risk." Ms. Feinberg concluded: "If you [are] comfortable taking this on, I will set up a working session w/ Liz [Novak], Jason [Foster], Warren [Kohm], and our FIN-01 Team to: . . . Discuss the opportunity & benefits of refreshing our approach to Cost Band Strategy . . . ."

48. On December 22, 2015, Ms. Feinberg emailed Mr. Foster: "I talked with Tim [Lawrence] yesterday about setting up a time to work through the Cost Band Strategy. He was fully supportive and has been talking with Liz [Novak] and Warren [Kohm] about this over the past couple months."

49. On or about January 1, 2016, Booz presented to the United States government (particularly, to the DCAA) its Cost Center / Band proposal for Fiscal Year 2017. That proposal was fraudulent for the reasons described above, including that it inflated certain Cost Center / Band costs to cover costs that Booz incurred in its Commercial / International operations, and it further inflated those costs to include Booz's SI costs, even where Booz knew that it could not demonstrate any benefit to the federal government from at least many of those SI costs.

50. Booz's FIN-01 team met on approximately a monthly basis with Booz's then-CFO, Mr. Cook. Beginning with the January 2016 meeting, those updates included particular reports on the Cost Center / Band issue.

51. Ms. Feinberg continued her work to better understand Booz's need to reform its Cost Center / Band structure, and to develop proposed solutions. In doing so, she met repeatedly

in early 2016 with Booz's compliance team (particularly, Mr. Foster and Ms. Kurtz).  She also met with Booz's planning team (particularly, Kathleen Henry, a Senior Associate in Finance, and Alfred McMurray, also a Senior Associate in Finance).  Ms. Henry and Mr. McMurray prepare Booz's annual budget, the Cost Centers / Bands plan, and the government disclosure regarding these rates.  During one January 2016 meeting between Ms. Feinberg, Ms. Henry, and Mr. McMurray, which lasted approximately 2 hours, Ms. Henry noted that not only does Booz inflate Cost Centers / Bands to cover the excess costs of its Commercial / International operations, it occasionally seeks even greater reimbursements from the federal government when one of those Cost Centers / Bands ends up, at the end of a fiscal year, with greater costs than revenue (a "rate variance" situation).  In those situations, Booz often returns to its U.S. federal government clients for additional payments to cover greater than anticipated Commercial / International costs, e.g., costs expended attempting to grow Booz's business with foreign companies and governments (entities that often maintain at least partially antagonistic relationships with the United States).

52. Having collected the above-described information, Ms. Feinberg worked with Mr. Lawrence to arrange a meeting with Booz's senior financial managers (below the level of the Chief Financial Officer), including Mr. Kohm and Laura Adams.  (Ms. Adams now is one of Booz's nine (9) "executive officers," in addition to serving as Booz's Corporate Controller and Chief Accounting Officer; at the time, she served at least as Booz's Corporate Controller).  Mr. Kohm delayed that meeting on several occasions, and, in approximately early February 2016, he left Booz.

53. With Mr. Kohm having exited, Ms. Feinberg successfully scheduled the above-described meeting for February 24, 2016.  The day before the meeting, Ms. Feinberg emailed the meeting attendees an advance copy of a PowerPoint presentation ("Cost Band Strategy Refresh")

that she had prepared.  Ms. Feinberg had prepared this presentation with input from Compliance

(particularly, Mr. Foster and Ms. Kurtz) and Planning (Ms. Henry and Mr. McMurray).  Included

on Ms. Feinberg's February 23 email, and in the February 24 meeting, were the FIN-01 team

(Messrs. Lawrence and Walls, and Ms. Feinberg), Compliance (Ms. Novak, Mr. Foster, and Ms.

Kurtz), and Planning (Ms. Henry and Mr. McMurray), all in addition to Ms. Adams, identified

immediately above; Robert Jones, Booz's finance lead for its Defense/Intelligence group; James

Dunnigan, Booz's finance lead for its Civil/Commercial group; Kelly Flynn, Booz's finance lead

for the SIG; Timothy Mach, Booz's finance lead for its international work; and Susan Camp, a

new Senior Associate with some experience regarding the proper formulation of cost bands.

  54. Ms. Feinberg's February 2016 PowerPoint presentation highlighted the

"**Legal/Compliance Risks**" of Booz's current method of doing business.  (Emphasis in original).

More particularly, Ms. Feinberg noted:  "Because Cost Bands (in practice) do not always

represent the type of work [being performed], our recoverable costs and IL [indirect labor] are

poorly aligned to the activities for which we are billing the government.  **This is a compliance**

**risk.**"  (Emphasis in original).  Even more pointedly:  "Aligning International Staff with lower

billability to a Cost Band that also houses U.S. Gov't Market staff with higher billability targets

results in Booz Allen overcharging the U.S. gov't for unrelated costs that are incurred

internationally.  **This is a compliance risk.**"  (Emphasis in original).  And Ms. Feinberg

reiterated Mr. Foster's earlier concern that Booz's Cost Centers / Bands "are often used merely

as a price point" rather than accurately to reflect costs, another "compliance risk."

  55. Ms. Feinberg's February 2016 PowerPoint presentation then expressly identified

Cost Centers / Bands 13, 14, 23, and 24 as encompassing both Commercial / International

employees and those working on federal government contacts:  "Yellow highlights draw

attention to the concern that Commercial and Int'l employees are in the same CCs [cost centers] as those billing to Gov't clients."

56. Ms. Feinberg's February 2016 PowerPoint also outlined possible solutions, while soliciting additional ideas.  She asked "How far out are Commercial & International from self sustainment?," while soliciting "Options for isolating them from Federal business subsidization to present to leadership."  Regarding CUT, Ms. Feinberg asked pointedly:  "How did we treat CUT in each CC [cost center]?  Did we rush to spend it on investments?  Did we give it back to the gov't?"

57. On February 24, 2016, the above-listed individuals met in-person regarding the Cost Center / Band issue, including the CUT issue.  The meeting lasted approximately 3 hours. Mr. Lawrence opened the meeting, and then turned it over to Ms. Feinberg for her February 2016 PowerPoint presentation and for discussion.

58. During this meeting, Mr. Lawrence suggested that Booz's current use of Cost Centers / Bands was acceptable but not optimal.  He stated that he understood, based on discussions with Mr. Kohm, that, because the Commercial / International operations did not make up 10% of some aspect of the company, the subsidization of those operations through charges to the U.S. government was non-material (and thus, he seemed to think, acceptable). Ms. Feinberg responded that in fact Booz's current operations involved substantial legal and compliance risks; Ms. Feinberg particularly solicited Ms. Novak's views on this issue, for the benefit of the group.  Ms. Novak stated that Booz's submission of Commercial / International costs was of particular concern, and also acknowledged the risks associated with Booz's submission of SI costs to the federal government.  Ms. Feinberg noted Mr. Kohm's November 3,

2015 observation that Booz had retained reserves to cover, at least partially, the eventuality that DCAA would discover Booz's conduct.

59. The February 24, 2016 meeting concluded with a plan to work to address the Cost Center / Band issue, and to work to develop additional possible solutions for consideration by the balance of Booz's most senior executives.  Pursuant to this direction, this group reconvened multiple times in the next several months.

60. Also in the Spring of 2016, Mr. Lawrence, Ms. Feinberg, and Mr. Walls began to meet particularly with Mr. Howell, who was in line to take over for Mr. Cook as Booz's Chief Financial Officer.  (Booz publicly had announced this anticipated succession on February 19, 2016, effective July 1, 2016.)  These meetings covered the FIN-01 initiative, and particularly included an explanation of the Cost Center / Band issue, including Booz's improper charges to the U.S. government of millions of dollars of costs incurred in attempting to develop its Commercial / International operations.  Mr. Howell initially expressed interest in this issue, and in finding a solution, particularly given Booz's already strained relations with DCAA.

61. One such meeting was an April 2016 lunch meeting between Messrs. Howell, Lawrence, and Walls and Ms. Feinberg.  For that meeting, Ms. Feinberg used a PowerPoint presentation ("Cost Band Strategy Refresh:  Introduction & Decision Points") modified from the one she had circulated on February 23 and presented on February 24.  Ms. Feinberg circulated this updated presentation to Messrs. Howell, Lawrence, and Walls a few days before the April meeting.  (Mr. Howell maintained a standing directive that, if a meeting participant wished to use a particular document in a meeting with him, he or she should circulate that document at least 48 hours before the meeting, so that Mr. Howell could review it in advance).

62. Before circulating her April 2016 PowerPoint to Mr. Howell, Ms. Feinberg emailed an advance copy to Messrs. Lawrence and Walls. Ms. Feinberg then received a telephone call from Mr. Lawrence. In that call, Mr. Lawrence directed Ms. Feinberg to modify the PowerPoint such that the previous bullet: "Aligning International Staff with lower billability to a Cost Band that also houses U.S. Gov't Market staff with higher billability targets *results in Booz Allen overcharging the U.S. gov't for unrelated costs that are incurred internationally*" to "Aligning International Staff with lower billability to a Cost Band that also houses U.S. Gov't Market staff with higher billability targets *results in an audit risk of cost shifting between the federal and non-federal contracts*." (Emphases added). Ms. Feinberg understood Mr. Lawrence to have made this request in an effort to make less obvious Booz's knowledge of its misconduct (i.e., in an effort to provide Mr. Howell some level of deniability as to knowledge of Booz's misconduct).

63. The PowerPoint used by Ms. Feinberg in the April 2016 meeting with Mr. Howell nonetheless made plain: "The status quo creates compliance and audit risks due to . . . [c]ost shifting between federal and non-federal contracts," and "Commercial and Int'l employees are in the same CCs [Cost Centers] as those billing to Gov't clients." Ms. Feinberg further emphasized: "The tendency towards using Cost Bands more as a price point rather than as the life-cycle delivery-based cost grid that we've disclosed to the govt creates audit risk around the integrity of our cost structure." Under a heading "Subsidizing Unprofitable Businesses," Ms. Feinberg observed: "To the extent feasible, costs should align to related revenues and should directly benefit the client who is being changed for the indirect cost." Ms. Feinberg then proposed, in part, "Comm & Int'l Separated from Gov't Business" and noted: "Separation from fed business mitigates Compliance Risks around cost allowability." She recognized, however:

"Businesses are not sustainable" and "firm profit" would decrease upon acknowledging "unallowable" costs. Ms. Feinberg asked "How much unallowable subsidization?"

64. In approximately late April 2016, Ms. Feinberg obtained from Mr. McMurray a copy of an internal Booz document describing the multiples that it was charging the federal government, through its Cost Centers / Bands, during Booz's Fiscal Year 2017. In this document, Booz broke out the costs associated with its Commercial / International operations and highlighted the divergent multiples obtained when Commercial / International operations were mixed with Booz's federal government contracting operations, and when they were segregated. While, on information and belief, these multiples substantially understated the actual divergence, the reality of the divergence nonetheless was starkly evident.

65. Ms. Feinberg also obtained various versions of another document—an internal profit and loss statement—that again demonstrated that Booz was tracking, internally, its extraordinary losses on its Commercial / International operations, and the (remarkably high) multiples generated by those operations when considered alone. This profit and loss statement was closely held within Booz. It was maintained by Mr. Kohm, while he was with Booz, and also by Beth Alster and Ben Thompson. This group shared the document with Mr. Lawrence and discussed its contents with him in regular meetings. (Ms. Feinberg understood that, while the contents of this document were described to Booz's most senior leaders, the document itself was not shared). As Ms. Feinberg worked to better understand the Cost Center / Band issue, and its quantitative impact, she requested access to this document. Initially, she was denied access. Later, at Mr. Lawrence's direction, she was allowed to view the document, and, still later, she was provided copies of certain versions of the document.

66. And Ms. Feinberg obtained a June 2016 PowerPoint ("Cost Band & Effective Multiple Management: Firmwide Summary").  This document was prepared by others at Booz and circulated to Booz management.  The document reported which Booz Cost Centers / Bands were, at that time, in rate variance or CUT, and which Booz operations were driving those Cost Centers / Bands in that direction.  More specifically, this document showed that Booz's Commercial / International operations were driving each of their Cost Centers / Bands (13, 14, 23, and 24) toward rate variance, and were doing so by underperforming regarding both expected billability and expenses.

67. Ms. Feinberg next organized a June 3, 2016 meeting between the FIN-01 team, Compliance (Mr. Foster), Planning (Ms. Henry and Mr. McMurray), and Matthew Calderone, Booz's Senior Vice President for Corporate Development.  In advance of that meeting, Ms. Feinberg on May 31, 2016 circulated to each of the above-listed individuals a PowerPoint presentation ("Cost Band Strategy Refresh:  Summary & Next Steps:  3 June 2016") similar to the one she had presented to Mr. Howell in April.  This presentation again highlighted "**Legal / Compliance Risks**" (emphasis in original):  "Because Cost Bands (in practice) do not always represent the type of work disclosed, our recoverable costs and IL [Indirect Labor] are poorly aligned to the activities for which we are billing the government.  This is a compliance risk.";  and "Aligning International Staff with lower billability to a Cost Band that also houses U.S. Gov't Market staff with higher billability targets results in an audit risk of cost shifting between federal and non-federal contracts.  This is a compliance risk."  In the PowerPoint for the June 3 meeting, Ms. Feinberg added a slide highlighting the fact that separating Booz's Commercial / International operations from its federal operations for purposes of constructing Booz's Cost Centers / Bands would yield substantially divergent multiples (i.e., substantially higher multiples

for Booz's Commercial / International operations, at least in part due to the high overhead and low billability associated with those operations).  Again, Ms. Feinberg noted that separating Booz's Commercial / International operations from its U.S. government contracting operations would "mitigate[] Compliance Risks around cost allowability"; she again acknowledged, however, that because Booz's commercial and international operations were not independently sustainable, Booz's total profits would suffer once Booz no longer was billing the U.S. government for "unallowable funds."  Under a column labeled "Analysis Required," Ms. Feinberg again pointedly asked:  "How much unallowable subsidization?"

68. The June 3, 2016 meeting was held at one of Booz's Washington, DC offices, namely its offices on Fifteenth Street, Northwest.  Most of the attendees participated in person, though Mr. Foster participated by telephone.  The aim of the meeting was to brief Mr. Calderone on the Cost Center / Band issue and the work thus far to identify a solution.  Mr. Calderone's understanding was important because he was a close advisor to Mr. Howell, and also to Booz Chief Executive Officer Horacio Rozanski.  (In addition to serving as Booz's CEO, Mr. Rozanski was particularly connected to these issues by virtue of "play[ing] a central role in . . . the 2008 separation of [Booz]'s core government and commercial businesses into two distinct companies, . . . and [Booz's] 2011 expansion into international and commercial markets.")  Mr. Calderone responded to the presentation, in part, by questioning whether Ms. Feinberg should have reduced Booz's misconduct to writing, as she did, in the PowerPoint presentation.  Mr. Calderone also expressed his hope (belatedly) that the information would not be presented in writing to Mr. Howell.

69. On June 29, 2016, Ms. Feinberg, with Mr. Lawrence and Ms. Novak, again briefed Mr. Howell regarding the Cost Center / Band issue.  This meeting lasted approximately 1

hour.  Again Ms. Feinberg used a PowerPoint ("FY18 Cost Band/Cost Structure Strategy:

Proposal & Next Steps:  29 June 2016"), which again laid bare Booz's misconduct in subsidizing

its Commercial / International operations by overcharging the United States government.  The

late June PowerPoint included, in addition to much of the language noted in prior versions, a

proposed solution (which, in part, would have placed Commercial / International operations into

cost centers / bands separate from those applicable to federal contracts, and also would have

segregated the SIG into its own cost center / band):

> **Overview.**  Employees aligned to Commercial and International
> Accounts (who currently sit in Cost Centers 13/23 and 14/24 [with]
> U.S. federal government staff) would be put into a single cost band,
> separate from the Civil and Defense & Intel Federal Cost Bands.
> Costs unique to Comm/Int'l would be captured in their OH
> [overhead] pool alone rather than spread across the business.  Since
> their lower billability and higher costs [would] no longer be
> subsidized by the Federal business, they [would] need to [take
> certain actions] until the currently unprofitable C/I [Commercial and
> International] businesses become[] profitable.

(Emphasis in original).  The late June PowerPoint further explained that its proposal would

"[r]educe[] the risk of penalties from DCAA as they begin auditing FY14-FY17 if we can

demonstrate that we removed unallowable C/I sustainment costs from the U.S. Federal Cost

Bands," but continued to acknowledge:  "The C/I business will not be sustainable in FY18

without the subsidization of the U.S. federal business" and "moving C/I into its own Cost Band

where the business needs to cover its own cost[s] would reduce Booz Allen's Profit."  Finally,

Ms. Feinberg emphasized:  "The SIG is subsidized by the Federal business, but [its] contribution

to the federal business is not tracked and the return on investment is not projected nor

evaluated."

70. Through this briefing, Ms. Feinberg sought guidance on next steps, including

which potential solutions—Ms. Feinberg noted that the proposed solutions "can be implemented

as a single effort in FY18 or broken out and implemented in phases"—should "be briefed to the LT [leadership team] members . . . and when."  Mr. Howell responded by expressing concern that Commercial / International operations would fail without their existing subsidization.  Ms. Feinberg agreed that those operations were not self-sustainable and offered that Booz likely would need to resort to an acquisition if it wished to stabilize those aspects of its business.

71. Two days later, on July 1, 2016, Mr. Howell officially assumed the position of Chief Financial Officer.

72. On July 14, 2016, Ms. Feinberg discussed by email with Christopher Whitney, a Lead Associate in Corporate Development, the idea of separating Booz's Commercial / International operations from its U.S. government contracting operations, to prevent future improper charges to the federal government, coupled with an acquisition that would bring solvency to Booz's Commercial / International operations.  More particularly, Ms. Feinberg explained: "One of the things we have discussed throughout this process is that separating the Commercial / Int'l business into its own Cost Band (mainly for compliance purposes) would require an acquisition to make it financially solvent.  How long would the due diligence take to vet potential targets?"  (Copied on this email was Lindsay Joyce, a Booz Senior Associate in Corporate Development).

73. Mr. Whitney was not receptive; he responded:  "I would not think about acquisitions that way."

74. Ms. Feinberg responded professionally but unflinchingly:

> From my perspective, the goal of an acquisition wouldn't just be to separate out the Commercial / Int'l piece as its own Cost Band.  The reason we are trying to separate out these businesses into their own cost band in the first place is because we are projecting losses of ~$220M on those two businesses over the next 2½ years. *The delta between Cost and Revenue for the non-federal businesses could*

> *easily be declared as "unallowable" by DCAA once they catch up*
> *with auditing FY12 and beyond. This means, in a best case scenario,*
> *we will have to pay back those unallowable costs to the government.*
> *There are worse potential outcomes, though, from a compliance,*
> *financial, and PR standpoint.*

(Emphasis added).

75. On Friday, July 22, 2016, Ms. Feinberg met again with Mr. Howell, along with

Mr. Lawrence, Compliance (Ms. Novak), and Planning (Ms. Henry and Mr. McMurray).  The

purpose of this meeting was to discuss the Cost Center / Band issue, the recommended solution,

and, now, the cost impact numbers regarding that proposed solution.  The attendees met at

Booz's Fifteenth Street offices in Washington, D.C.  Mr. Lawrence and Ms. Novak participated

by telephone.  The meeting originally was scheduled for an hour and a half, but was reduced to a

single hour during the scheduling process.  Mr. Howell began the meeting by announcing that he

now would provide only a half hour for the meeting.

76. At the July 22 meeting, Ms. Feinberg used an expanded version of her

PowerPoint presentation ("FY18 Cost Band Proposal – Impact Analysis:  22 July 2016") to

explain the Cost Band issue, her recommended solution, and the expected associated costs.  An

opening slide provided an overview of her presentation, including:  "Situation:  Status quo

creates compliance risks and difficulties in managing costs" and "Proposal:  Four

recommendations that mitigate compliance risks . . . ."  Ms. Feinberg then highlighted the "**Legal**

**/ Compliance Risks**" as to which she had been blowing the whistle, internally, for nearly nine

(9) months now (emphasis in original):  "The current Cost Bands are structured by type of work

performed by staff aligned to [them], but it is not uncommon that desired price point drives use.

This . . . puts the integrity of our disclosed cost structure at risk.";  "Because Cost Bands (in

practice) do not always represent the type of work disclosed, our recoverable costs and IL

[Indirect Labor] are poorly aligned to the activities for which we are billing the government. **This is a compliance risk**.”; and “Aligning Non-U.S. Government staff with lower billability to a Cost Band that also houses U.S. Gov't Market staff with higher billability targets results in an audit risk of cost shifting between federal and non-federal contracts. **This is a compliance risk**.” (Emphases in original). Ms. Feinberg again used “[y]ellow highlights [to] draw attention to the concern that Commercial and Int'l employees are in the same CCs [Cost Centers] as those billing to Gov't clients.” Ms. Feinberg again highlighted that, when the Commercial / International operations are separated from the federal government operations for purposes of constructing Costs Centers / Bands, the Commercial / International operations yield a substantially higher multiple. Ms. Feinberg then quantified the current situation and the impact of her proposed solutions, explaining, in part, that the Commercial / International operations “would be insolvent because [they are] slated to spend $65M more than [they] generate[] in Revenue from FY17-FY19” and, further, that Booz's projected $149M Commercial / International job profit over that same time period “would evaporate if the [Commercial / International operations] were required to cover [their] own costs rather than pushing them off to [the] profitable portion of the business in [certain Cost Centers / Bands].”

77. Mr. Howell concluded the abridged meeting by announcing that, while the meeting participants had performed good and important work on the project, he was not willing to devote further resources to addressing the Cost Center / Band issue but, instead, planned to focus elsewhere. When Ms. Feinberg reiterated that the Cost Center / Band issue required a solution, Mr. Howell noted that Booz kept risk reserves for the eventuality that the United States uncovered the unallowable nature of Booz's charges. Mr. Lawrence then stated that, in fact, Booz had not kept any such reserves for the current fiscal year (Fiscal Year 2017); this was a

surprise to the other meeting participants.  Mr. Howell nonetheless persisted in his refusal to take action.

78. Later on July 22, Ms. Feinberg wrote to Mr. Lawrence: "So I'm not really clear on next steps based on the discussion with Lloyd [Howell] this morning.  If fixing the Cost Band structure for the FY18 planning cycle isn't doable or a priority, I'm unclear on how to help further the FIN-01 initiatives."

79. Mr. Lawrence responded the next day:  "I feel your frustration…" (Ellipsis in original).

80. On July 26, 2016, Mr. Lawrence and Ms. Feinberg spoke by telephone for approximately an hour and a half.  They discussed why Mr. Howell might have declined to rectify Booz's misconduct.  Ms. Feinberg made clear that, given Mr. Howell's refusal to act, she intended to leave Booz.  Mr. Lawrence encouraged her to stay, and particularly suggested the Investor Relations position that they previously had discussed.

81. That evening, Ms. Feinberg offered "to consolidate the recommendations we put forward throughout the FIN-01 Initiative into a deck before I leave."

82. The next day, July 27, 2016, Mr. Lawrence responded:  "I think this would be extremely valuable."

83. Later on July 27, 2016, Ms. Feinberg met with Ms. Henry (Planning) and Ms. Joyce (Corporate Development).  The meeting participants discussed that Ms. Feinberg planned to leave Booz in light of Mr. Howell's decision to take no action on the Cost Center / Band issue.  They further discussed transitioning their knowledge on this issue to the Corporate Development employees who would be taking the lead on the planning process, including Messrs. Calderone and Whitney.  Also during this July 2016 meeting, the participants reviewed a "Portfolio View"

document prepared by Ms. Joyce, with assistance from Ms. Henry.  This document again

demonstrated the awareness of Booz officials that Booz's government contracting operations

were subsidizing its Commercial / International operations and SIG.  Using Booz's Fiscal Year

2016 numbers, this document showed that segregating Booz's federal government contracting

operations from its Commercial / International operations and SIG would have left the federal

government contracting operations in a substantial Cost Under Target ("CUT") situation (and

thus Booz should have returned substantial funds to its federal government clients), whereas

Booz's failure to segregate those operations had left it, instead, in a substantial net Rate

Variance.  This document further suggested that Booz was (falsely) declaring a "Job Profit" with

respect to its commercial and international operations, respectively, and that those "Job Profits"

were being summed by Booz to reach a total Job Profit for its "Defense and Intelligence Market"

operations and "Civil Commercial Market" operations, respectively, and ultimately to obtain a

firm-wide Job Profit.

     84. In late July, Ms. Feinberg communicated with Mr. Foster via SkypeChat.  Mr.

Foster expressed his understanding and respect for Ms. Feinberg's decision to leave Booz in light

of Booz's failure to rectify its misconduct.  Mr. Foster expressed some hope that Ms. Feinberg's

actions, eventually, would spur Booz to address the Cost Center / Band issue.

     85. On July 31, 2016, Ms. Feinberg wrote the following to Mr. Calderone:

> I am attaching the FY18 Cost Band Strategy Impact Analysis deck
> that I briefed to Lloyd [Howell] last week.  Although he ha[d] been
> positive about this effort until the meeting we had last Friday, *he
> rejected the entire proposal saying that it was not a priority for the
> near future.*  It sounds like your team is going to be involved in the
> FY18 planning cycle, so I hope you will take a look at [the] deck
> and consider some of the concepts as you begin the planning cycle.
> *I realize your team is dismissive of the compliance and financial
> risks and that has likely influenced Lloyd's view on the necessity of
> this effort.  But there are real concerns that you will need to address*

*in FY18 and beyond to mitigate risks incurred from the subsidization of the Commercial / International business by the federal practice, the lack of market alignment and accountability with the current costs & cost band structure, and the lack of consistency in how we disclose vs. utilize Cost Bands.*

*The unwillingness to address these issues will have a negative impact on our DCAA audits and relationship with the government and it will have an extremely negative impact on our EBITDA margins when we have to start paying back the unallowable C/I costs that we built were built [sic] into our federal rates.* While C/I only makes up 2% of the revenue of the firm, it makes up over 8% of the costs. These are costs that will be charged to Booz Allen when DCAA begins auditing recent years. *The amount of planned costs for next year that will likely be declared unallowable make up 20% of the Net Income of the Firm.* I realize that we can't change everything at once, but I thought that there would be an effort to start acting like a public firm and take these risks seriously once Warren [Kohm] & Kevin [Cook] left and Lloyd [Howell] came in to reset the agenda and direction for the firm. I was excited about working for him and with your team on this effort.

I told Tim Lawrence this week that I am resigning and will be leaving Booz Allen in the next two weeks. I do not feel comfortable working in Finance for a publicly traded firm that does business with the federal government if driving Net Income for our shareholders and mitigating compliance risks for our primary client, the U.S. gov't, is not the highest priority. I will be on PTO [personal time off] for the next few days, but will be meeting with Lindsay [Joyce] and Christopher [Whitney] at the end of the week to provide them an overview of the issues we presented to Lloyd for their awareness as they begin learning the planning process. It is fantastic that your team is bringing their skills and expertise to the planning cycle, but I highly recommend that you involve the people who understand the firm's cost structure – Katie Henry & Alfred McMurray – and people who understand the compliance concerns – Jason Foster & Liz Novak.

Good luck on your efforts. I wish you and the firm the best.

(Emphases added).

86. On August 4, 2016, Ms. Feinberg met, along with Ms. Henry, with Mr. Whitney.

(Ms. Joyce was on maternity leave). This meeting lasted approximately one hour. Ms. Feinberg

and Ms. Henry explained the Cost Center / Band issue and their recommended solution.  Mr.

Whitney responded dismissively, and objected to the "agenda" presented.  Mr. Whitney further

commented that he did not know whether Booz was acting improperly because he was "not

Compliance."

        87. On August 8, 2016, Ms. Feinberg provided Mr. Lawrence with formal notice of

her resignation, effective August 26, 2016.  Ms. Feinberg explained:

> It is with great regret that I resign my position with Booz Allen Hamilton, effective August 26, 2016.  *Booz Allen is currently incurring more financial and compliance risk than I feel comfortable defending as a member of the Corporate Finance team.*
>
> As a publicly traded firm whose primary client is the U.S. federal government, our priorities should be driving return for our shareholders and ensuring that we are able to continue doing profitable business with the U.S[.] Government.  These goals do not appear to be the primary focus of the leaders in the firm, which is of particular concern given our relatively new status as a publicly-traded company.  Decisions appear to be made for the entire firm based on personalities and politics rather than analysis, data, mitigating compliance risks, and a shared goal of improving shareholder return and client delivery.
>
> It's been a privilege to work with great people at Booz Allen for the past 6 years.  I applied to Booz Allen while waiting for a flight home after a combat deployment to Iraq.  Booz was my first post-Marine Corps job and I was able to continue working with Marines at the firm and for Marines at the Pentagon.  The leaders I met here were amazing mentors, wrote my graduate school recommendations, encouraged me to take risks in pursuing an MBA, supported my decision to take time off to spend time with my family when I had children, and were gracious enough to ask me to come back to work with the Finance Team on this FP&A transformation initiative upon completing my MBA at Wharton last year.
>
> I have learned a lot this past year working with you and Tad and ESG [Enterprise Services Group] and am still hopeful that the recent leadership changes will take the firm back in the right direction.  I appreciate the confidence that you had in bringing me onto this project and your willingness to entertain and debate new ideas and proposals.  I was thrilled for the opportunity to use my operational

experience and academic knowledge from business school in this role to propose changes to leaders in the firm—and it is my sincere hope that at some point they will be taken seriously.

*The FY18 Cost Band Strategy I worked on most recently was an attempt to mitigate compliance risks and fix the underlying complexity of the firm that is driving poor cost management, lack of accountability, risky subsidization of failing businesses and cannibalization of the profitable businesses in the firm.* This plan, while developed and supported by stakeholders who understand the risks of the status quo, was rejected in favor of priorities like implementing an HR IT system, developing a better ADEPS model, and new strategies that have yet to be defined. *I am not comfortable moving onto other roles within the firm if these financial risks and compliance concerns are not being prioritized by decision makers.*

Thank you for the opportunity to work on such important matters at a firm I care deeply about. It is my sincere desire that these issues are addressed because Booz Allen is a great company that is doing excellent work for our clients.

(Emphases added).

88. On or about August 16, 2016, Ms. Feinberg responded to a Booz request that she complete a survey, apparently designed for out-going employees, regarding her experience at Booz. In explaining her decision to leave Booz, Ms. Feinberg reiterated, again, many of her statements from her July 31 email to Mr. Calderone and her August 8 email to Mr. Lawrence.

89. In approximately her final week at Booz, Ms. Feinberg emailed to Mr. Lawrence the FIN-01 post-mortem that she, on July 26, 2016, had offered to prepare, and that Mr. Lawrence, on July 27, 2016, had encouraged. Ms. Feinberg then met with Mr. Lawrence, for approximately an hour to an hour and a half, to discuss that document. Slides 1-38 of that PowerPoint ("ESG Transformation Initiative FIN-01: Metrics, Reporting & Analytics, and Forecasting: Summary of Findings, Recommendations, and Outcomes: 1 April 2015 – September 2016") provided an overview of the FIN-01 project, Ms. Feinberg's discovery and exposure of the false claims issue, and the refusal of Booz leadership to remedy that issue.

Those slides noted, for example, that recommendations to "decrease compliance risk" were "dismissed or delayed," and particularly that reform of Booz's "Cost Band Structure" "was rejected in July [2016] because of different priorities taking precedence."  This final PowerPoint also reiterated many of the concerns noted above, including:  "The multiples used by C/I [Commercial / International operations], though, do not include the true costs of the business since C/I staff have lower billability, higher IL [indirect labor] requirements, require more ESG support per capita, and work in higher cost facilities."

90. Friday, August 26, 2016, was Ms. Feinberg's final day at Booz.

91. On August 30, 2016, Booz's Deputy General Counsel, Brenda K. Morris, wrote to Ms. Feinberg, demanding that Ms. Feinberg return or destroy any Booz "proprietary information" in her possession, in particular the "FY18 Cost Band Impact Analysis"—i.e., the PowerPoint she had been using to brief senior Booz officials regarding Booz's misconduct.

92. On September 2, 2016, Darren Geary, another Booz law department employee, emailed Ms. Feinberg, asking her to "confirm you have deleted all BAH propriety [sic] date [sic] from your personal Gmail account."

93. On information and belief, Booz never disclosed to the government its knowing submission, for years, of false claims on myriad government contracts, notwithstanding its obligation to do so, including under 48 C.F.R.52.203-13.  Indeed, also on information and belief, Booz never took any action to remedy that misconduct—other than the referenced attempts to prevent Ms. Feinberg's disclosure of certain documents to those defrauded government clients. And, finally, and also on information and belief, Booz continued—and continues—regularly to submit false claims in conformance with its fraudulent Cost Centers / Bands.

94. On September 26, 2016, Ms. Feinberg filed this lawsuit.

95. On May 22, 2017, Messrs. Rozanski and Howell, as CEO and CFO, respectively, made various certifications in the annual report (SEC Form 10-K) of Booz Allen Hamilton Holding Corporation, including regarding the accuracy of the information reported therein, the adequacy of the corporation's internal controls, and that each had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

96. On June 15, 2017, Booz Allen Hamilton Holding Corporation announced that, "[o]n June 7, 2017, [Booz] was informed that the U.S. Department of Justice is conducting a civil and criminal investigation relating to certain elements of [Booz]'s cost accounting and indirect cost charging practices with the U.S. government."  In that announcement, and notwithstanding all of the above, Booz Allen Hamilton Holding Corporation further stated, without caveat:  "To date, our internal and external audit processes have not identified any significant deficiencies or material weaknesses, or identified any significant erroneous cost charging."

## CLAIMS FOR RELIEF

### Claim I:  Violation of 31 U.S.C. § 3729(a)(1)(A)

97. Ms. Feinberg hereby incorporates all the paragraphs of this First Amended Complaint.

98. By virtue of the acts described above, Booz knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States government.

99. As a result of these false or fraudulent claims, the United States government suffered damages.

### Claim II:  Violation of 31 U.S.C. § 3729(a)(1)(B)

100.      Ms. Feinberg hereby incorporates all the paragraphs of this First Amended Complaint.

101.      By virtue of the acts described above, Booz knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval to officers or employees of the United States government.

102.      As a result of these false or fraudulent claims, the United States government suffered damages.

### Claim III:  Violation of 31 U.S.C. § 3729(a)(1)(D)

103.      Ms. Feinberg hereby incorporates all the paragraphs of this First Amended Complaint.

104.      By virtue of the acts described above, Booz had possession, custody, or control of property or money used, or to be used, by the United States government and knowingly delivered, or caused to be delivered, less than all of that money or property.

105.      As a result of these false or fraudulent claims, the United States government suffered damages.

### Claim IV:  Violation of 31 U.S.C. § 3729(a)(1)(G)

106.      Ms. Feinberg hereby incorporates all the paragraphs of this First Amended Complaint.

107.      By virtue of the acts described above, Booz knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States government, or knowingly concealed or

knowingly and improperly avoided, or decreased, an obligation to pay or transmit money to the government.

108.    As a result of these false or fraudulent claims, the United States government suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Feinberg prays for judgment against Booz as follows:

    a.  A permanent injunction requiring Booz to cease and desist from violating the False Claims Act;

    b.  Judgment against Booz in an amount equal to three times the amount of damages the United States has sustained as a result of Booz's unlawful conduct;

    c.  Pre- and post-judgment interest;

    d.  Civil monetary penalties for each false and fraudulent claim submitted to the United States by Booz;

    e.  An award to Ms. Feinberg pursuant to 31 U.S.C. § 3730(d);

    f.  An award of reasonable attorneys' fees, costs, and expenses; and

    g.  Such other and further relief that the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Ms. Feinberg demands a trial by jury of all issues so triable.

DATED this 28th day of July 2017

Matthew G. Kaiser (D.C. Bar No. 486272)
Justin Dillon (D.C. Bar No. 502322)
Jonathan S. Jeffress (D.C. Bar No. 479074)

William Pittard (D.C. Bar No. 482949)
KaiserDillon PLLC
1401 K Street, Northwest, Suite 600
Washington, District of Columbia  20005
(202) 640-2850 (telephone)
(202) 280-1034 (facsimile)
mkaiser@kaiserdillon.com
jdillon@kaiserdillon.com
jjeffress@kaiserdillon.com
wpittard@kaiserdillon.com

Jonathan K. Tycko (D.C. Bar No. 445851)
Tycko & Zavareei LLP
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia  20036
(202) 973-0900 (telephone)
(202) 973-0950 (facsimile)
jtycko@tzlegal.com

*Attorneys for Plaintiff Sarah A. Feinberg*

## CERTIFICATE OF SERVICE

I hereby certify that, as to the foregoing First Amended Complaint, I caused, on this July 28, 2017, (1) its hand-filing with the Clerk's Office for the United States District Court for the District of Columbia, and (2) its service, by electronic and first class mail, on the United States (and only the United States, per 31 U.S.C. § 3730(b)(2)), as follows:

Brian Hudak, AUSA
Wynne Kelly, AUSA
United States Attorney's Office for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530
Brian.Hudak@usdoj.gov
Wynne.Kelly@usdoj.gov

Melissa Goforth-Koenig, Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
601 D Street NW, PHB 9213
Washington, DC 20004
Melissa.Goforth-Koenig2@usdoj.gov

_____
William Pittard